IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROBERT MURPHY, Individually and as the Representative of a Class of Similarly Situated Persons,<br><br>Plaintiff,<br><br>vs.<br><br>PROFESSIONAL TRANSPORTATION, INC.<br>Defendant. | Case No. 14-CV-378-SMY-DGW |

# **MEMORANDUM AND ORDER**

Plaintiff Robert Murphy[1] is the named plaintiff, individually and on behalf of all similarly situated persons, in a single count Amended Class Action Complaint against Defendant Professional Transportation, Inc. ("PTI"), alleging violations of the Illinois Prevailing Wage Act ("IPWA"), 820 ILCS 130/1, *et seq*. (Doc. 14). Now pending before the Court is Plaintiff's Amended Motion for Class Certification (Doc. 62). PTI filed a response in opposition (Doc. 67). During the hearing on the motion, the Court ordered additional briefing which the parties have filed (Docs. 101,103). Plaintiff also filed an additional supplemental brief regarding Plaintiff's qualifications to serve as Class Representative, to which PTI responded (Docs. 116, 117).[2] For the following reasons, Plaintiff's Amended Motion for Class Certification is **DENIED**.

---

[1] The original named plaintiff was John Garecht. Plaintiff Murphy was substituted as the named plaintiff after Garecht's death. (Doc. 108).

[2] Plaintiff filed for leave to submit a reply brief. (Doc. 118). In the absence of exceptional circumstances, reply briefs are generally not permitted under local rules. SDIL-LR 7.1(c). There being no exceptional circumstances shown, the motion will be denied by separate order.

1

**Background**

PTI is a corporation that provides transportation services. (Doc. 67 at 3-4). Plaintiff Robert Murphy and the putative class members were employed by PTI as drivers assigned to provide ground transportation services to the Union Pacific Railroad, allegedly in connection with track replacement work on the Illinois High Speed Rail Project. (Doc. 14 at ¶ 11). The crux of Murphy's claim is that this work falls within the scope of the IPWA, but that he and the putative class members were paid less than the applicable prevailing wage.[3] PTI responds that the IPWA is inapplicable for a variety of reasons. For purposes of class certification, the Court will assume (without deciding) that the High Speed Rail Project in general and the work allegedly performed by the putative class members may be subject to the IPWA.

*The Job*

According to original named plaintiff John Garecht's deposition, his job with PTI involved transporting train crews to different projects in a minivan. (Deposition of John Garecht,[4] Doc. 67-1 at 16, 25-26). On days when he was assigned to the High Speed Rail Project, he would pick up a conductor, an engineer and a brakeman from their hotel, take them to their train and follow the train as it went down the track. (*Id.* at 36). At lunchtime, he would take one of the crew members to pick up food for the group, and would take them back to the hotel at the end of their shift. (*Id.*). In addition to transporting the crew, he would occasionally haul an End-of-Train ("EOT") device and water. (*Id.* at 26-27). He drove through a number of different counties while transporting High Speed Rail Project crews. (*Id.* at 63).

---

[3] The putative class members' actual rate of pay is unclear from the pleadings. In Plaintiff's Memorandum in Support of his Amended Motion for Rule 23 Class Certification, Plaintiff asserts that it was $8.25. (Doc. 63 at 5). However, in the accompanying Declaration by proposed class counsel Terry Smith, Smith states that he calculated damages using a rate of $9.50 per hour, as "I believe this to be above what defendant actually paid members of the class." (Doc. 63-2).

[4] The deposition transcript is included as part of a multi-document exhibit. Citations to depositions refer to the page numbers in the deposition transcript itself.

Plaintiff Murphy's deposition testimony regarding his job duties was very similar. He also testified that the job took him through different counties within a workday (Deposition of Robert Murphy, Doc. 116-1 at 57) and that he would transport things besides passengers, such as EOT devices and supplies. (*Id.* at 43). Additionally, he would sometimes function as a "blocker" at uncontrolled railroad crossings, placing his vehicle across the lanes and directing traffic, though he could not recall how many times he had done so in the State of Illinois. (*Id.* at 41, 43).

## *The Illinois Prevailing Wage Act*

The IPWA requires that workers be paid no less than the "general prevailing rate of hourly wages for work of a similar character on public works in the locality in which the work is performed[.]" 820 ILCS 130/3.[5] Under the IPWA, "locality" is defined as "the county where the physical work upon public works is performed[.]" 820 ILCS 130/2. There are two exceptions to the application of the term: (1) if there is not a sufficient number of competent skilled laborers, workers and mechanics to construct the public works efficiently and properly, "locality" can mean any other county nearest the one in which the work or construction is to be performed and from which such persons may be obtained in sufficient numbers to perform the work; and (2) certain contracts for highway work. *Id.*

The Illinois Department of Labor ("IDOL") periodically publishes listings of the prevailing wage by county and job classification.[6] The job classifications vary by county and the listings include the types of work performed by each classification. The job classifications can

---

[5] The question of whether the High Speed Rail Project, funded at least primarily by a federal grant under the American Reinvestment and Recovery Act of 2009 (Pub. L. 111-5), falls under the scope of the IPWA is a separate issue which the parties address and debate in the summary judgment context. It need not be resolved for purposes of class certification, however, as it would be a common question for all putative class members.

[6] Available at https://www.illinois.gov/idol/Laws-Rules/CONMED/Pages/Rates.aspx

3

vary even within a county. For example, Livingston County's description of the Class 1 Truck Drivers category varies depending on whether the work is performed in the northwest or southeast portion of the county. Moreover, the classifications are often very specific as to job duties—the current southeast Livingston County Class 1 Truck Driver explanation from May 2011 reads:

> Two or three Axle Trucks. A-frame Truck when used for transportation purposes; Air Compressors and Welding Machines, including those pulled by cars, pick-up trucks and tractors; Ambulances; Batch Gate Lockers; Batch Hopperman; Car and Truck Washers; Carry-alls; Fork Lifts and Hoisters; Helpers; Mechanics Helpers and Greasers; Oil Distributors 2-man operation; Pavement Breakers; Pole Trailer, up to 40 feet; Power Mower Tractors; Self-propelled Chip Spreader; Skipman; Slurry Trucks, 2-man operation; Slurry Truck Conveyor Operation, 2 or 3 man; Teamsters; Unskilled dumpman; and Truck Drivers hauling warning lights, barricades, and portable toilets on the job site.

https://www.illinois.gov/idol/Laws-Rules/CONMED/Rates/11-05May/LIVINGST.htm. By contrast, the explanation for the northwest portion of the county specifies two axle trucks hauling less than nine tons, among other things. *Id.*

These published listings are not exhaustive. The statute provides a mechanism for determining the prevailing wage for any covered job on a given project. Specifically, the public body awarding the contract is required to "ascertain the general prevailing rate of hourly wages in the locality in which the work is to be performed, for each craft or type of worker or mechanic needed to execute the contract" or it may request that the IDOL do so. 820 ILCS 130/4(a). The IDOL's published Prevailing Wage Rate documents similarly direct that for classifications not otherwise set out or for tasks not subject to one of the stated classifications, the IDOL should be contacted to make a determination. Factors to be considered in determining similarity of work include the requisite skills, training, and knowledge. *Illinois Landscape Contractors Ass'n v. Dep't of Labor,* 372 Ill. App. 3d 912, 923, 866 N.E.2d 592, 602 (2007). The statute also provides

4

for both administrative and judicial review of prevailing wage determinations. 820 ILCS 130/9.

The IPWA provides a cause of action for any covered laborer, worker or mechanic "who is paid for his services in a sum less than the stipulated rates for work done under such contract" for the difference there may be between the amount paid and the stipulated rate, together with costs and attorney's fees. 820 ILCS 130/11. A violator is liable to the state for a penalty of 20 percent of such an underpayment, and a plaintiff is entitled to a punitive damage award of two percent of that penalty for each month during which such underpayments remain unpaid. *Id.* Implicit in the enforcement scheme is an assumption that there is a stipulated rate associated with the underlying contract—that is, that there was an advance determination regarding the applicable prevailing wage for the given task on the given project in the given locality.

## **Legal Standard**

Murphy moves for class certification under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. He seeks to represent a class defined as follows:

> Current and former PTI employees who are or were employed by defendant as drivers and provided ground transportation services of train crews to the Union Pacific railroad in conjunction with the construction of the Illinois High Speed Rail project and were not paid the prevailing wage in accordance with Illinois law since 2010. (Doc. 14 at ¶59).

To be certifiable, a class must first be definable and meet the requirements of numerosity, commonality, typicality and adequacy of representation. *See* Fed. R. Civ. P. 23(a); *Alliance to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir. 1977). If the action meets those requirements, it must then fall within one of the three enumerated Rule 23(b) categories. *Spano v. The Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011) ("(1) a mandatory class action (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior.").

A class may be certified only if a district court is "satisfied, after a rigorous analysis," that compliance with Rule 23 has been shown, even if the analysis entails some overlap with the merits. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Although a plaintiff bears the burden of showing that the proposed class satisfies the Rule 23 requirements, he "need not make that showing to a degree of absolute certainty." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012)(internal citation omitted).

## Discussion

While the proposed class in indisputably definable, PTI raises an objection that the proposed class constitutes a "fail-safe" class. A fail-safe class is one that, under the law of this circuit, is improperly defined based on success on the merits. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015). Fail-safe classes are improper because "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner*, 669 F.3d at 825.

Here, the class definition is not fail-safe, despite incorporating a reference to statutory law. Even if a putative class member is found to have been paid the correct amount under Illinois law, either because the IPWA does not to apply or because they were paid at a rate commensurate with the prevailing wage, they would still be bound by the Court's Judgment. Therefore, PTI's objection is rejected.

### *Rule 23(a) Requirements*

#### <u>Numerosity</u>

In order to meet the numerosity requirement, Murphy must establish that there are a sufficient number of class members that joinder would be impractical. "Although there is no 'bright line' test for numerosity, a class of forty is generally sufficient." *McCabe v. Crawford &*

6

*Co.,* 210 F.R.D. 631, 643 (N.D. Ill. 2002) (citation omitted). This is not a hard-and-fast rule, however. "A class can be certified without determination of its size, so long as it's reasonable to believe it's large enough to make joinder impracticable and thus justify a class action suit." *Arnold Chapman and Paldo Sign & Display Co. v. Wagener Equities Inc.,* 747 F.3d 489, 492 (7th Cir. 2014). A court may make common sense assumptions in determining numerosity. *Rawson v. Source Receivables Management, LLC*, 289 F.R.D. 267, 269 (N.D. Ill. 2013). However, "actual, not presumed, conformance with Rule 23(a) remains ... indispensable." *Dukes*, 564 U.S. at 351 (*quoting General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160 (1982)).

Murphy's assertion that there are 45 potential class members who performed this type of work for PTI on the High Speed Rail Project is supported only by the Declaration of Murphy's counsel. (Doc. 63 at 7). Counsel's Declaration goes into great detail about what additional discovery *may* show, but the only actual source referenced is "trip/run data provided to Murphy's counsel relevant to the 223 TRT project" from Excel spreadsheets. (Doc. 63-2 at ¶¶ 10, 11).[7] Counsel claims that he has gained experience working with such spreadsheets from prior litigation with Defendant. (*Id.* at ¶ 10). Based upon his examination of the spreadsheets, he concluded that "[t]here were a total of 45 individual employees for whom defendant has records providing ground transportation services to the UP work train crews assigned to the 223 TRT project." (*Id.* at ¶ 11A). Murphy did not provide the underlying records or any other evidence of numerosity to the Court.

---

[7] During the hearing on the Amended Motion for Class Certification, Plaintiff's counsel represented that he had received and reviewed additional documentation from PTI and Union Pacific and that the estimate remained at 45 potential class members. (Doc. 102 at 13). However, Counsel did not indicate what the additional documentation consists of, leaving the Court to rely solely upon Counsel's Declaration.

There are three problems with Murphy's case for numerosity. First, the Declaration of Murphy's counsel does not constitute evidence sufficient to satisfy the "rigorous analysis" required for class certification. The Seventh Circuit has not explicitly addressed whether the Federal Rules of Evidence apply to materials submitted in connection with class certification and some courts within the Circuit have taken inconsistent positions on the issue. *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*, No. 3:09-CV-20001-DRH, 2012 WL 865041, at *7 (S.D. Ill. Mar. 13, 2012) (holding that the Federal Rules of Evidence apply at the class certification stage); *cf. Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, No. 09-CV-0852, 2016 WL 3579953, at *2 (E.D. Wis. June 24, 2016) (refusing to consider issues of admissibility and authenticity of evidence at the class certification stage). At the same time, several other courts in this Circuit have side-stepped the issue – simply referring to and relying on the "broad discretion" afforded a court in ruling on class certification. *See Quality Mgmt. & Consulting Servs. v. SAR Orland Food Inc.*, No. 11 C 06791, 2013 WL 5835915, at *2 (N.D. Ill. Oct. 30, 2013); *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 146 (N.D. Ill. 2017).

Regardless of which approach this Court chooses to adopt, the Declaration standing alone is inadequate to satisfy Murphy's burden to establish numerosity. *See McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 797 (7th Cir. 2017) (leaving undisturbed the district court's decision to strike a declaration from a paralegal as to the number of potential class members, where the paralegal had no personal knowledge of the data, lacked the expertise to interpret it, and the Murphys had not designated her as an expert witness). The Declaration sets forth Counsel's interpretation of the spreadsheets. Although he may be familiar with PTI's spreadsheets from prior litigation, he does not claim to or demonstrate that he has any personal knowledge about the underlying data or the expertise to interpret it. Simply put – Counsel's

8

declaration constitutes mere speculation as to the number of putative class members. Whether the Court excludes the Declaration by direct application of the Federal Rules of Evidence or simply affords it little evidentiary weight, it is too slim a reed to survive the rigorous analysis required for class certification.

Secondly, Murphy's position on numerosity is also undermined by the specific factual basis underpinning his counsel's interpretation of the spreadsheet. Counsel estimated the number of potential class members by identifying individuals "providing ground transportation services to the UP work train crews assigned to the 223 TRT project." During the relevant period, code notation "223 TRT" was utilized by PTI in keeping track of which project a given driver was assigned to on a given day. Murphy maintains that this code was specific to work performed in association with the High Speed Rail Project. (Doc. 102 at 15-16). In support of his contention, Murphy relies upon the deposition testimony of Jason McGrew, a PTI employee who formerly worked as a Branch Manager, Special Projects Manager and Regional Manager and who was involved in making the High Speed Rail Project transportation arrangements. (Doc. 101-1 at 18, 22, 68).

> Q: Do you know what the code 223 TRT means?
>
> A: Yes. That was the branch designation for the TRT project for purposes of, I don't know, I guess for recordkeeping. Or that's the -- when drivers were working on that project, they were assigned to Branch 223.
>
> Q: And is Branch 223 a physical building or physical city or location?
>
> A: No.
>
> Q: Okay. Something that's set up for the TRT project?
>
> A: That's correct.

(*Id.* at 68).

However, PTI asserts that the code was not unique to the High Speed Rail Project but that it was also used to denote work on other track replacement projects. (Declaration of Danny Barr, PTI Regional Vice President for Central Operations, Doc. 67-1 at 26-27). Specifically, Barr attests that "223 TRT" is a "general code used for work in various states," and that it means "that PTI's driver's [sic] performed transportation work for Union Pacific workers engaged in track replacement work somewhere in the United States." (*Id.*). He further attests that there were no codes, terms or records that specifically segregated or designated work performed on the High Speed Rail Project. (*Id.* at 27).

The Court finds McGrew's testimony that 223 TRT "…was the branch designation for the TRT project for purposes of…I guess for recordkeeping" and "...that's the -- when drivers were working on that project, they were assigned to Branch 223" both ambiguous and speculative. As such, it does not effectively refute or contradict Barr's attestations which are unambiguous and based on first-hand knowledge.

Finally, Murphy has not proffered any facts or argument as to why or how joinder would *actually* be impractical in this case. Rather, he rests on the proposition that a proposed class of 40 members is generally considered impractical for joinder. But, as previously noted, actual rather than presumed compliance with Rule 23(a) is required for class certification. This is especially the case when, as here, there has been no showing that 45 is an accurate estimate of the putative class size. *See Pruitt v. City of Chicago, Ill.*, 472 F.3d 925 (7th Cir. 2006) (affirming denial motion for class certification where there was no showing by the moving party that joinder of 40 possible class members would not be practicable). Because Murphy has failed to sufficiently establish the number of potential class members or to show that joinder would be impractical, he has failed to satisfy the numerosity requirement.

*Commonality*

Rule 23(a)(2) requires at least one question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2); *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). This is a low threshold that may be met with a showing that the class' claims depend on a common contention capable of class-wide resolution, even if there are other factual variations among the grievances of the class members. *Id.* at 594. To satisfy commonality, the putative plaintiffs' "claims must depend on a common contention" and "[t]hat common contention…must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 564 U.S. at 350. "A common nucleus of operative fact is usually enough to satisfy the commonality requirement." *Keele,* 149 F.3d at 594. This standard is generally met where "defendants have engaged in standardized conduct towards members of the proposed class." *Id.* "Rule 23(a)(2) does not demand that every member of the class have an identical claim," and some degree of factual variation will not defeat commonality provided that common questions yielding common answers can be identified. *Spano,* 633 F.3d at 585.

In this case, the proposed class members' claims all arise under the same statute and involve common legal issues. In order to determine whether PTI is liable to any putative class member, the Court must determine whether the IPWA applies to the High Speed Rail Project in general and whether the type of work performed by the drivers on the project falls within the scope of the IPWA. This meets the low threshold for commonality.

*Typicality*

For typicality, "there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to

11

litigate on behalf of the group." *Spano*, 633 F.3d at 586. The typicality requirement addresses concerns that (1) the representative's claim may fail on unique grounds, dooming meritorious claims of absent class members or that (2) the representative's claims may prevail on unique grounds, and the representative may therefore fail to adequately present alternative grounds under which the unnamed class members could prevail on their own claims. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011). Typicality is satisfied if the named representative's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and ... [the] claims are based on the same legal theory." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992).

Murphy has made a sufficient showing that PTI had a policy of paying its drivers based on a scale that was less than what might have been dictated had the IPWA's provisions been applied. Although Murphy may or may not have performed work as a "blocker" while employed on the High Speed Rail Project, it appears that this was secondary to his defined duties, and therefore does not set him apart from the other putative class members so as to render his claim atypical. While a potentially unique defense and credibility questions may apply to Murphy's claim as discussed in the Court's adequacy analysis below, his claim clearly arises from the same practice and course of conduct by PTI that gives rise to the claims of the other putative class members. Thus, the typicality requirement is satisfied.

### *Adequacy*

For purposes of Rule 23(a)(4), "adequacy of representation is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (quotation omitted). The

adequacy requirement is satisfied when the named representative has "a sufficient interest in the outcome of the case to ensure vigorous advocacy" and "does not have interests antagonistic to those of the class." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 480 (N.D. Ill. 2009). PTI does not challenge the adequacy of class counsel and the Court has no reason to believe they are not qualified or that they will not fairly and adequately represent the interests of the class.

As to whether Murphy is an adequate class representative, the Court first notes that Murphy may be subject to a unique defense which could compromise his ability to adequately represent the class. "The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation. The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *CE Design*, 637 F.3d at 726.

PTI alleges that "due to an administrative error, Murphy was overpaid in the amount of $2211.84 in a two week period in July of 2012 when he performed work for PTI in Illinois" and thus may be liable for an offset to any recovery. (Doc. 117 at 3). Murphy disputes this fact. (Doc. 118). While PTI has not filed an Amended Answer or otherwise formally asserted this issue as an affirmative defense, it is an "arguable" defense which does not appear to pertain to the remaining class members. Resolving it would require specific inquiry into the circumstances of the alleged overpayment and any liability thereon, adding a separate aspect to the case which has nothing to do with the class. That said, this potential defense in and of itself does not make Murphy an inadequate class representative. But the Court's analysis doesn't end there.

A putative class representative "must demonstrate that he will fulfill his fiduciary duty to the class he purports to represent; reason to doubt the ability to meet his fiduciary obligations

13

results in denying class certification." *Wagner v. Lehman Bros. Kuhn Loeb Inc.*, 646 F. Supp. 643, 661 (N.D. Ill. 1986). Relatedly, a named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative. *CE Design,* 637 F.3d at 726; *see also In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 197 (S.D.N.Y. 1985) ("A class representative is a fiduciary to the class, and his failure to comply with the requirements of discovery bears upon whether he will adequately fulfill his fiduciary obligations.").

PTI served interrogatories on Murphy after he was substituted as the named plaintiff and proposed class representative. (Doc. 115-2). One of the interrogatories asked whether he had been "convicted of a felony crime, or any crime which involves dishonesty or false statement" and requested that he provide details of any such conviction. (*Id.* at ¶4). Murphy responded, "Plaintiff has not[.]" (*Id.*) He signed the interrogatory responses, declaring "under penalty of perjury" that the answers were true and correct. (*Id.* at p. 16). However, during his deposition, he admitted that he had been convicted in 1999 of voluntary manslaughter and armed criminal action and was sentenced to ten years' incarceration. (Doc. 115-1 at 117-119). Murphy attributed his inconsistent responses to having "breezed through" the interrogatory responses, not fully reading them before signing them, not paying attention to the fact that these were sworn responses and only reading them in full "later." (*Id.* at 114-15). There is no indication in the record precisely when Murphy reviewed his responses "in full" and no indication that he made any effort to correct or supplement his response.

Murphy's felony convictions are not a *per se* bar to being a class representative. *See Streeter v. Sheriff of Cook Cty.*, 256 F.R.D. 609, 613 (N.D. Ill. 2009). In fact, it is unclear from the record whether his convictions would ultimately be independently admissible under Federal

14

Rule of Evidence 609.  What is problematic, however, is Murphy's failure to disclose the convictions in discovery.  "[T]aking an active and *honest* and attentive and role in discovery is one of the hallmarks of an otherwise adequate class representative." (emphasis added). *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, 254 F. Supp. 3d 1007 (N.D. Ill. 2017) *citing Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 502–03 (S.D . Tex. 2004) *and Silver v. LA Fitness Int'l, LLC*, 2013 WL 5429293, at *2 (E.D. Pa. 2013).  If he intentionally did not tell class counsel about his past convictions in an attempt to conceal them, then he lacks the basic honesty required of the position.  If, as he claims, Murphy missed the glaring inaccuracy in his sworn statement because he "breezed through" it and did not really read the responses before signing, then he failed his obligation to be active and attentive.  Similarly, his failure to correct the inaccuracy after he fully read his responses also sheds a questionable light on his willingness and ability to meet his fiduciary obligations to the class.

Murphy's failure to disclose his convictions in discovery potentially raises a question regarding his credibility.  That issue, coupled with PTI's potential defense to Murphy's claim may significantly hamper his ability to meet his fiduciary obligations to the class.  For these reasons, the Court concludes that Murphy is not an adequate class representative.

### *Rule 23(b) Requirements*

In addition to the requirements of Rule 23(a), a plaintiff seeking class certification must satisfy one of Rule 23(b)'s three subsections.  Here, Murphy proceeds under Rule 23(b)(3), which allows for certification upon a finding that "questions of law or fact common to members of the class predominate over any questions affecting only individual members," and that "a class action is superior to other available methods for resolving the controversy."  Fed. R. Civ. P. 23(b)(3).

"Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815 (quotation omitted). "If, to make a *prima facie* showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question." *Id*. (quotation omitted). Predominance "trains on the legal or factual questions that qualify each class member's case as a genuine controversy" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 624 (1997). The predominance requirement overlaps considerably with Rule 23(a)(2)'s commonality requirement, although the predominance requirement is "far more demanding." *Id*. "Where liability determinations are both individual and fact intensive, class certification under Rule 23(b)(3) is improper." *Miller v. Janssen Pharmaceutical Prod., L.P.*, No. 05-CV-4076-DRH, 2007 WL 1295824, at *7 (S.D. Ill. May 1, 2007).

There are common questions relative to the claims of the putative class members in this case, including whether the IPWA applies to the High Speed Rail Project as a whole and whether the work performed by the drivers falls within the statute's scope. However, there would be significant individualized inquiries that would need to be made regarding each driver. Assuming *arguendo* that the IPWA does apply to the High Speed Rail Project and the work performed by the class members, the issue of the 223 TRT coding looms large. Murphy asserts that a notation on the spreadsheets of 223 TRT is synonymous with work on the High Speed Rail Project. However, as previously noted, the evidence indicates that the code was used for other track replacement projects as well. Therefore, an individualized inquiry would need to be made for

16

each class member in order to determine whether in fact they worked on the High Speed Rail Project on a given day.

Additionally, complex individualized inquiries would be required to determine damages. The IPWA requires that workers be paid no less that the "general prevailing rate of hourly wages for work of a similar character on public works in the locality in which the work is performed[.]" 820 ILCS 130/3. Thus, ascertaining damages for each class member requires an individualized determination of the prevailing wage that applies. This presents a problem because the statutory scheme does not lend itself to retrospective application – it assumes that public bodies will conform its process and "ascertain the general prevailing rate of hourly wages in the locality in which the work is to be performed, for each craft or type of worker or mechanic needed to execute the contract" either itself or by application to the IDOL before the work is commenced. 820 ILCS 130/4(a). Because an advance determination was not made as to the work in question in this case, the fact finder would be required to go through the job classifications for each county (or portion of a county, in those instances where different definitions are used in different parts of a county) in which a putative class member worked and attempt to ascertain whether there are any published classifications which a public body or IDOL would have considered "work of a similar character" for a given month. This would in turn require an inquiry into what skills, training, and knowledge were required for both the PTI driver job and the potentially similar jobs. If there was no adequately similar listing in the publicly available IDOL listings, some method would have to be devised to determine what the IDOL would have concluded under the statutory scheme for unlisted jobs.

Assuming the appropriate rate for each area could be determined, the fact finder would then have to apply it to every hour (or portion thereof) that each driver spent in each locality.

Both Garecht and Murphy testified that they would cross multiple county lines in a day, and Garecht admitted that the prevailing wage he believed he was owed would vary from county to county. (Docs. 67-1 at 63, 82; 116-1 at 27). As such, calculation of the damages would require examination of how long each driver spent in each locality. There is no suggestion in Murphy's Amended Motion for Class Certification as to how such an examination could be made in the absence of individualized inquiry of the drivers.[8]

Murphy essentially concedes that this presents an obstacle to class certification and attempts to avoid the problem by stipulating to a single rate of pay for damage calculations. (Doc. 101 at 8-9). This is not appropriate. A plaintiff's damages case must be consistent with its liability case. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). The claim is brought under the IPWA, and the right of action is grounded solely in the statutory language. The statute is quite specific that the prevailing wage rate is dependent on the place where the work was performed and the wage paid for similar work on public works in that area. Since the applicable prevailing wage rate is the starting point for the damage calculation, the local character of that rate cannot simply be disregarded. A unilateral stipulation to an hourly rate to be used regardless of locality is inconsistent with the statutory scheme.[9]

This problem of individualized damage issues is not itself sufficient grounds to deny certification. *See Mullins*, 795 F.3d at 671. As the Seventh Circuit has noted, it is permissible under Rule 23(c)(4) to bifurcate a class action, treating liability as a class matter and holding "separate hearings to determine—if liability is established—the damages of individual class

---

[8] Mention has been made at various points in the litigation regarding GPS tracking of the PTI vehicles. It is unclear what information PTI's system tracked and retained, and the Court will not speculate as to this point.

[9] Additionally, PTI notes that the source of the rate cited by Plaintiff is the United States Department of Labor rate, which Plaintiff has explicitly denied as being applicable in this case.

members, or homogeneous groups of class members[.]" *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013). However, when combined with the individualized proof required to establish liability, these issues make class certification inappropriate.

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3) was designed for situations ... in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate[.]" *Murray v. GMAC Mortgage Corp.,* 434 F.3d 948, 953 (7th Cir. 2006) *citing Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir. 1997).

Conversely, class treatment may be rejected when, as is true in this case, all or almost all of the claims are likely to be large enough to justify individual litigation. *Murray*, 434 F.3d at 953. Murphy estimates damages of $835,373.53— $412,921.16 in unpaid wages and $422,452.37 in statutory damages.[10] (Doc. 63 at 7). Accepting for the sake of analysis Murphy's estimate of 45 class members, this averages out to over $18,000 per class member, although each member's share of the recovery would vary based upon how many hours they worked. Additionally, the IPWA contains a provision for payment of attorneys' fees in a successful suit, making it more economically feasible for individual plaintiffs to bring suit than in many class action contexts. 820 ILCS 130/11. These factors suggest that individual litigation is the superior method for resolving these claims.

## Conclusion

As Plaintiff Robert Murphy has failed to meet his burden under *F.R.C.P*. 23(a) and 23(b) with respect to numerosity, adequacy of representation and predominance, his Motion for Class Certification (Doc. 62) is **DENIED.**

---

[10] This total was introduced before Plaintiff attempted to stipulate to a single wage rate for damages purposes.

**IT IS SO ORDERED.**

**DATED: November 27, 2017**

                                                   **s/ Staci M. Yandle**
                                                   **STACI M. YANDLE**
                                                 **United States District Judge**